## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CLAYTON ANDREWS,

        Plaintiff,

    v.

THE BRETHREN MUTUAL
INSURANCE COMPANY,

        Defendant.

No. 4:19-CV-02107

(Chief Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 12, 2023

## I.    BACKGROUND

This dispute arises from Defendant The Brethren Mutual Insurance Company's decision to deny an insurance claim submitted by Plaintiff policyholder Clayton Andrews. Andrews purchased a commercial property in Shamokin, Pennsylvania and insured it with a policy from Brethren. Less than five months after the purchase, the property burned down. Andrews submitted a claim to Brethren, who investigated and denied the claim on the grounds that the fire had been set intentionally, either by Andrews or at his direction. Andrews proceeded to file suit against Brethren. A trial is set to begin on November 13, 2023. Ahead of trial, Andrews has filed seven Motions in Limine seeking to exclude evidence relating to: (1) the purchase price of the property; (2) a prior water loss claim filed by Andrews and paid by Brethren; (3) prior fire loss claims filed by Andrews' brothers; (4) the sale of the property following the fire; (5)

limitation damages; (6) the expert opinion and testimony of Richard Andress; and (7) the type and amounts of insurance coverage Andrews purchased from Brethren. Brethren filed a Motion in Limine seeking to exclude evidence of the absence of an arrest of prosecution by law enforcement arising from the fire. Brethren does not oppose Andrews' Motion regarding his brothers' prior fire loss claims and Andrews does not oppose Brethren's Motion, so the Court will grant the relief requested in both. The Court addresses the remaining Motions in turn.

## II.      Motions in *Limine*

Motions *in limine* are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions"[1] A court may decide the motion before trial or defer a decision until during trial.[2] The movant seeking to admit evidence carries the burden of proof to meet the threshold of admissibility under the relevant rule or principle.

## III.     ANALYSIS

### A.      Purchase Price

Andrews seeks to preclude Brethren from introducing into evidence the price Andrews paid, $45,000, to purchase the property. He argues that the purchase price is irrelevant because the property was insured for replacement value; "the amount of coverage was entirely based upon the building make-up, its square footage, and

---

[1]     *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).
[2]     *See United States v. Adams*, 36 F.4th 137, 150 (3d Cir. 2022).

Brethren's internal process and procedures for determining coverage."[3] Brethren argues that the purchase price of the Building is relevant, because it shows that Andrews "had a strong financial motive to set fire to the premises."[4]

"Arson is an affirmative defense and therefore the defendant has the burden of proving by a preponderance of the evidence that the fire was of an incendiary origin and that the plaintiff was responsible for it."[5] The insurance company need not present direct evidence that the plaintiff caused the fire; it may meet its burden through circumstantial evidence.[6] An insurer seeking to prove its case via circumstantial evidence generally must show evidence of: "(1) an incendiary fire; (2) a motive by the insured to destroy the property; and (3) circumstantial evidence connecting the insured to the fire."[7] It is well established that financial motive is sufficient to satisfy the second factor.[8] This includes evidence that the insured stood to receive a financial windfall due

---

[3]   Purchase MIL Br., Doc. 64 at 6.

[4]   Purchase MIL Opp. Br., Doc. 87 at 2.

[5]   *Doylestown Dodge, Inc. v. Great Am. Ins. Co.*, 1985 WL 3285 at *6 (E.D. Pa. Oct. 25, 1985) (collecting cases).

[6]   *Ruttenberg v. Fire Assoc. of Philadelphia*, 186 A. 194, 195 (Pa. Super. 1936).

[7]   *Mele v. All-Star Ins. Corp.*, 453 F. Supp. 1338, 1341 (E.D. Pa. 1978); *accord Sperrazza v. Cambridge Mut. Fire Ins. Co.*, 459 A.2d 409, 410-11 (Pa. Super. 1983).

[8]   *E.g.*, *Ly v. Universal Property & Cas. Ins. Co.*, 2021 WL 1837468, at *4 (E.D. Pa. May 7, 2021); *Merrone v. Allstate Vehicle and Property Ins. Co.*, 2019 WL 5310576, at *6 (W.D. Pa. Oct. 21, 2019); *Wells v. State Farm Fire and Cas. Co.*, 2013 Wl 6044371, at *2-3 (E.D. La. Nov. 14, 2013); *Auto Club Family Ins. Co. v. Mullins*, 2012 WL 6043652, at *5 (N.D. Ala. Nov. 29, 2012); *State Farm Property and Cas. Ins. Co. v. Hargis*, 2010 WL 1662179, at *3 (W.D. Ky. Apr. 23, 2010) (citing *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1250 (6th Cir. 1984)); *Randle v. Allstate Indem Co.*, 649 F. Supp. 2d 675, 679 (N.D. Ohio 2009); *U.S. v. Martin*, 523 F.3d 281, 290 (4th Cir. 2008); *St. Paul Fire & Marine Ins. Co. v. Salvador Beauty College, Inc.*, 930 F.2d 1329, 1332 (8th Cir. 1991).

to the insured value of the property exceeding the purchase price.[9] Andrews' argument that the purchase price is irrelevant because he did not seek a particular coverage type or amount is unavailing. Andrews may argue to the jury that he did not create the financial motive, but there is no question one existed.

Andrews also argues that, even if the purchase price is relevant, it should be nevertheless excluded on the grounds that it is unfairly prejudicial. The Court agrees that the evidence is prejudicial—when a building purchased for $45,000 and insured for $2.8 million burns down, it is likely to raise a few eyebrows—but it does not agree that it is unfairly so. Evidence of high probative value will often be highly prejudicial. This is insufficient to render the prejudice unfair. The Court also notes that Andrews purchased the building just over four months prior to the fire, which is probative of a motive to receive an immediate financial windfall. Finally, evidence of financial motive, no matter how strong, is insufficient on its own for Brethren to prevail, somewhat lessening the prejudicial impact of evidence of the purchase price.

### B.      Post-Fire Sale and Sale Price

Andrews seeks to exclude evidence that he sold the vacant commercial land for $225,000 after the fire.[10] Brethren argues that evidence of the sale of the property is relevant to Andrews' "motive to set, either directly or indirectly, the fire which is the

---

9    *See Musha v. USAA Gen. Indem. Co.*, 2011 13160343, at *4 (S.D. Ga. Dec. 14, 2011) (finding evidence of financial motive where the insured purchased a house for $168,500 and had it insured for $221,000).

10   Sale MIL, Doc. 69,

subject matter of the litigation."[11] The parties' arguments on this issue are not particularly well developed. While it is true that Andrews sold the property for $180,000 more than he paid for it, other factors such as the value of the building as it stood before the fire and the time, materials, and equipment lost in the fire would bear on the financial motive to set fire to the building rather than simply sell it as it was. However, Andrews has not cited any such record evidence or other authority in support of his arguments. Though the Court finds that evidence of the sales price is less probative than that of the purchase price, it does not find that it has no probative value. Further, Brethren specifically argues that Andrews received a financial windfall by "having [Brethren] cover the expenses associated with the demolition and debris removal of the fire-damaged remains and selling the land for exactly five times the amount paid for the structure."[12] To the extent that Brethren is arguing that the property was worth more as a vacant lot and that Andrews fraudulently induced Brethren into paying to clear the land, the evidence of the sales price is not duplicative of the evidence of the purchase price as Andrews suggests. Therefore, the Court will deny Andrews' motion to exclude evidence of the sale of the property.

### C.   Water Loss

Andrews seeks to exclude evidence of a water loss claim—for which Brethren paid Andrews $32,295 in losses—arising out of flooding of an upper floor of the

---

[11]   Sale MIL Opp., Doc. 88 ¶ 7.
[12]   Sale MIL Opp. Br. 2-3.

building.[13] He argues that the water loss claim and the related evidence is irrelevant to the fire at issue in the case.[14] He suggests that, by paying the claim after "investigation failed to reveal any evidence that Mr. Andrews was responsible for the flood," "Brethren acknowledged that the water loss claim was legitimate."[15] Brethren argues that Andrews' statements subsequent to the payout for the water loss claim shows that the claim was fraudulent and "set into motion a course of conduct."[16] Brethren further argues that Andrews' inconsistent statements regarding the cause of the flooding are admissible for impeachment purposes.[17]

Federal Rule of Evidence 404(b)(2) allows for the admission of "a crime, wrong, or other act" as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Brethren's argument that admission of the water loss claim "will provide focus to the jury concerning [Andrews'] fraudulent schemes"[18] assumes the conclusion that the water loss claim was fraudulent. Andrews' argument that Brethren would not have paid out a claim it believed was fraudulent is well taken. The question then is whether Brethren has introduced evidence sufficient to show that Brethren got it wrong the first time.[19] The Court finds that it has not.

---

[13]  Water Loss MIL, Doc. 65 ¶ 2
[14]  Water Loss MIL Br., Doc. 66 at 5.
[15]  *Id.*
[16]  Water Loss MIL Opp., Doc. 84 ¶ 3.
[17]  Water Loss Opp. Br., Doc. 85 at 2.
[18]  *Id.*
[19]  *See Huddleston v. U.S.*, 485 U.S. 681, 689 n.6 (1988) ("In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred, and the defendant was the actor.").

Dennis Gordon, the independent insurance adjuster retained by Brethren to investigate the water loss claim was advised that Andrews "apparently had some workers do some maintenance work to the dwelling. A garden hose was hooked up to a sink in the closet area with a nozzle at the end. The spigot was kept in the 'on' position, which allowed for pressure to gather within the garden hose, which eventually leaked."[20] Asked at his deposition if he denied telling Gordon that he had workers in the building using the hose Andrews responded: "I don't deny it. I might have told him that they could have used it. I don't know what my maintenance guys would have done to use it, maybe cleaning something up, yes. I could have told him that, yes."[21] Andrews also testified that he was not sure who had used the hose, or for what purpose the hose had been used.[22] Andrews was also interviewed by Shamokin Police Chief Raymond Siko following the fire and Siko noted that, when asked if he had any prior insurance claims, Andrews said "someone opened a locked door where a sink was located at, attached a hose to it, turned it on and flooded the first floor which needed to be repaired" and that he "was the only one who had a key to the closet where the hose and sink were located."[23] Siko confirmed this apparent inconsistency during a deposition.[24]

To the extent that these statements are inconsistent they are not enough, on their own, to compel the conclusion that the water loss claim was fraudulent. The

---

[20] Water Loss MIL Opp. ¶ 2 (quoting Water Loss Notice, Ex. A., Doc. 84-4).
[21] Andrews 2018 Dep., Doc. 84-5, 89:18-25; *see also* Water Loss MIL Opp. ¶ 2.
[22] Andrews 2018 Dep. 86:22-87:11, 89:9-25, 90:25-92:11, 93:5-10.
[23] SPD Incident Report, Ex. E, Doc. 84-7 at 6.
[24] Siko Dep., Doc. 84-8, 141:25-142:14.

inconsistency between Andrews' testimony and the statements he gave to Gordon rely on both Gordon's characterization of Andrew's statements to him, and Andrews' recollection of that conversation which occurred months earlier. The evidence of inconsistent statements given to Siko suffer from the same flaw: Siko's notes are from his interview with Andrews on December 26, 2017,[25] over five years before his deposition.[26]

To buttress their argument that the water loss claim was fraudulent, Brethren also suggests that Andrews "did not effectuate repairs from the water loss for which he received insurance proceeds."[27] Here, Brethren's argument proves too much. When asked during his deposition if the water damage had been repaired prior to the fire, Andrews responded "no, *not fully*,"[28] Andrews testified that he hired, and presumably paid for, a remediation company (at Brethren's direction) after the loss.[29] He testified that he had purchased the materials to repair the floor[30] and that he was "getting somebody in to do the carpet, redo the carpet in the basement."[31] Brethren asks the Court to overlook all of the steps Andrews did take, simply because he had not actually

---

[25]   SPD Incident report at 5.
[26]   *See Pinkney v. Meadville, Pa.*, --- F. Supp. 3d ----, 2023 WL 24297, at \*18 (W.D. Pa. 2023) ("Because of reliability concerns, the rules expressly exclude police reports as inadmissible hearsay.") (quoting *Krepps v. Gov't of Virgin Islands*, 47 V.I. 662, 672 (D.V.I. 2006), *aff'd* 438 F. App'x 86 (3d Cir. 2010)). *But cf. Sarauw v. Fawkes*, 66 V.I. 254, 270 (V.I. 2017) (observing that the inconsistency between statements "made in a very short duration" was "without legitimate excuse or explanation").
[27]   Water Loss Opp. ¶ 2.
[28]   Andrews 2023 Dep., Doc. 84-6, 9:10-13 (emphasis added).
[29]   Andrews 2018 Dep. 96:12-25.
[30]   *See* Andrews 2018 Dep., Doc. 65-1, 110:20-25 (testifying that he purchased "tiles, glue, and paint").
[31]   Andrews 2018 Dep., Doc. 84-5, 96:6-11.

repaired the damage yet. Andrews taking these steps, spending time and money on repairs, does not suggest that the claim was fraudulent—it suggests just the opposite.

As the party seeking to admit the evidence, Brethren carries the burden of proof to show that it is admissible. It may be that Brethren could prove by a preponderance of the evidence that the water loss claim was fraudulent. However, the Court finds that Brethren has not done so here and agrees with Andrews that allowing Brethren the opportunity to do so at trial would create an unacceptable danger of confusing the issues; this trial is about the fire loss, not the water loss.[32] The Court is also mindful of the danger posed by allowing Brethren to introduce evidence of the water loss claim if it cannot prove that the claim was fraudulent. Courts have excluded evidence of prior fire loss claims in similar cases on the grounds that "prior fire losses have no relevance to the present fire" and "[s]uch evidence would only be highly prejudicial to the plaintiff."[33] The relevance of the water loss claim here is more attenuated; it was a different type of loss, for a substantially smaller dollar amount.

The Court will grant Andrews' Motion in Limine to exclude any evidence of the prior water loss claim.

---

[32] *See U.S. v. Green*, 617 F.3d 233, 249 (3d Cir. 2010) ("To be admissible under Rule 404(b), evidence of uncharged crimes must . . . satisfy Rule 403.") (citing *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001)); *U.S. v. Hans*, 738 F.2d 88, 95 (3d Cir. 1984) (observing that even if evidence is "admissible under Rule 404(b), it still has to meet the balancing requirements of Rule 403").

[33] *Cantor v. Nat'l Union Fire Ins. Co.*, 12 Phila.Co.Rptr. 232, 237 (Pa. Com. Pl. 1985); *see also American Nat'l Prop. and Cas. Co v. Felix*, 399 F. Supp. 3d 324, 353 (W.D. Pa. 2019) (denying motion for new trial and reaffirming decision to exclude evidence of prior fire loss claim).

### D.      Limitation of Damages

Andrews asks the Court to require that, if Brethren is found liable, the damages should be for the replacement cost value of $2,865,000, not the actual cash value at the time of the loss or the market value of comparable properties in the Shamokin area.[34] As noted by Brethren, "the policy of insurance specifically dictates that an insured is not entitled to replacement cost unless he rebuilds or repairs the [property] subject to certain time limitations."[35] There is no dispute that Andrews did not rebuild or repair the property. Instead, Andrews suggests that he is excused from doing so because "Brethren's denial of coverage and refusal to pay Mr. Andrews replacement costs coverage under the Policy constitutes a waiver of its ability to limit damages to the actual cash value."[36]

In support of his argument that the Court should not enforce the policy condition requiring him to rebuild or replace the property within a certain amount of time, Andrews cites *Ferguson v. Lakeland Mut. Ins. Co.*,[37] where the Pennsylvania Superior Court held such a provision unconscionable.[38] In a later case, *Burton v. Republic Ins. Co.*,[39] the Superior Court clarified that an insured is excused from the replacement requirement where:

---

[34]  Damages MIL, Doc. 71 ¶ 10.
[35]  Damages MIL Opp. Br., Doc. 93 at 2.
[36]  Damages MIL Br., Doc. 72 at 5.
[37]  596 A.2d 883 (Pa. Super. 1991).
[38]  Damages MIL Br. 10.
[39]  845 A.2d 889 (Pa. Super. Ct. 2004).

(1) the insurer denied liability;

(2) the insureds faced the 'unsavory' choice of either accepting actual cash value or expending a large sum in replacement costs without a guarantee of reimbursement; and

(3) any payment of replacement value by in the insurer hinged on the insured either expending funds or obtaining a judicial determination of liability.[40]

The Court finds that all three elements are satisfied here. Brethren admits that, notwithstanding its advance of funds for debris cleanup, it denied coverage,[41] leaving Andrews in a position where he would have needed to spend over $2 million to rebuild the property[42] and then obtain a favorable judgment in court before being reimbursed.

Brethren argues that, even if the Court excuses Andrews from the time limitation, Andrews "must still demonstrate that he would have replaced the property as required."[43] In support, Brethren cites two out-of-state cases, *Conrad Brothers v. John Deere Ins. Co.[44]* and *Bailey v. Farmers Union Co-Op. Ins.*,[45] in which courts ruled in favor of the insured. In *Conrad Brothers*, the Iowa Supreme Court held that the insurer repudiated its obligation under the contract and found that there was "substantial evidence from which the court could have concluded Conrad Bros. would have repaired

---

[40] *Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 269 (E.D. Pa. 2019) (citing *Burton*, 845 A.2d at 898-99; *Rotell v. Erie Ins. Grp.*, 53 Pa. D. & C. 4th 533, 544 (Comm. Pl. 2001)).

[41] Damages MIL ¶ 9; Damages MIL Opp. ¶ 9. The Court notes that Brethren states its "declination of coverage letter . . . speaks for itself." This is an improper response. *State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 279, 279 (N.D. Ill. 2001). The Court takes Brethren's admission that it denied coverage to mean just that.

[42] *See* Coverage MIL Opp., Doc. 82 ¶ 5 (noting that Brethren determined the cost to replace the building to be approximately $2.8 million).

[43] Damages MIL Opp. Br. 2.

[44] 640 N.W.2d 231 (Iowa 2001).

[45] 498 N.W.2d 591 (Neb. Ct. App. 1992).

but for John Deere's repudiation."[46] In *Bailey*, the Nebraska Court of Appeals ruled in favor of the insured on the grounds that "[a] condition is excused if the occurrence of the condition is prevented by the party whose performance is prevented by the party whose performance is dependent upon the condition."[47]

In *Utica Mutual Insurance Company v. Cincinnati Insurance Company*,[48] the United States District Court for the Eastern District of Pennsylvania, held that Pennsylvania's "prevention theory approach" is not inconsistent with the holdings in *Conrad Brothers* and *Bailey*. Under the prevention theory approach, "[t]he inquiry focuses on the insurer's actions and their consequences for the insured's ability to perform—*i.e.*, whether the insurer paid actual cash value or denied liability altogether and whether denying funds made it impossible, or at least unduly risky, for the insured to comply with the replacement condition."[49] Then, "the insured must still demonstrate that, but for the insurer's denial of payment, it would have replaced the property as required."[50]

The Court finds that, in this case, Brethren's denial of coverage is sufficient to carry this burden.[51] This is consistent with *Bailey*, in which that court "w[ould] not allow [the insurer] to raise a defense [insured's] failure to perform an act which [insurer]

---

[46] *Conrad Brothers*, 640 N.W.2d at 242.

[47] *Id.* at 598 (citing *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453 (1987)).

[48] 362 F. Supp. 3d 265 (E.D. Pa. 2019).

[49] *Id.*

[50] *Id.* (citing *Conrad Brothers*, 640 N.W.2d at 242; *Bailey*, 498 N.W.2d at 599).

[51] *See Conrad Brothers*, 640 N.W.2d at 242) (". . . the insured must prove the repudiation *materially contributed* to its nonperformance") (citing Restatement (Second) of Contracts § 255) (emphasis added).

itself *greatly hindered* [insured] from performing."[52] To the extent that the court in *Conrad Brothers* required more from the insured, that case is distinguishable because there the insurer had issued a check to the insureds for the actual cash value ($60,037.50), but not the replacement cost ($120,075).[53] In this case, Brethren advanced only $100,000 and compliance with the requirement to rebuild or repair the building would have required Andrews to spend far more than the $60,000 in *Conrad Brothers*. Thus, Brethren's denial of coverage "materially contributed" to Andrews' nonperformance.[54]

Nevertheless, Brethren asserts that "the evidence at trial will establish that [Andrews] had no intention of replacing the property and would have only received actual cash value had no coverage dispute arisen."[55] On the limited record before it, the Court is not prepared to preclude Brethren from introducing such evidence. Therefore, the Court will allow Brethren the opportunity to do so prior to ruling on Andrews' Motion.

### E.    Andress Opinion

Andrews seeks to exclude the expert testimony and report of Russel L. Andress, the fire expert retained by Brethren. During the pendency of this matter, Brethren originally retained Alex Profka as a fire expert.[56] Profka prepared a report regarding his

---

[52]   498 N.W.2d at 599 (quoting *Pollack v. Fire Ins. Exch.*, 423 N.W.2d 234, 237 (Mich. Ct. App. 1988)).
[53]   640 N.W.2d at 235.
[54]   *Cf. Conrad Brothers*, 640 N.W.2d at 242.
[55]   Damages MIL Opp. Br. 3.
[56]   Andress MIL ¶ 6.

assessment of the cause of the origin of the fire dated February 28, 2020.[57] Profka unfortunately passed away on January 23, 2022.[58] Brethren subsequently retained Andress, who prepared his own report.[59] Andrews argues that Andress' report and testimony should be excluded because "the proffered opinions (1) simply 'parrot' the ideas and conclusions of Mr. Profka; (2) are not the product or reliable principles or methods; and (3) are based entirely on unsupported speculation and conjecture and not facts of record."[60]

Federal Rule of Evidence 702 requires that expert testimony is (1) qualified, (2) reliable, and (3) assists the trier of fact.[61] Andrews does not dispute the qualifications of Andress, only that his opinions are not reliable and would not assist the trier of fact. As to the latter, Andrews argues that Andress' opinions would not assist the jury because they "are based entirely on speculation with regard to what may have actually caused the fire and who was responsible for it."[62] Whether the testimony will assist the trier of fact turns on whether it is "'sufficiently tied to the facts of the case,' so that it 'fits' the dispute."[63] "This condition goes primarily to relevance."[64] Andress' determination that "an accelerant was poured onto the stairs to enhance the speed and

---

[57] Profka Report, Ex. A., Doc. 73-1 p. 2-21.
[58] Andress MIL Opp. Br. 2.
[59] Andress Report, Opp. Ex. B, Doc. 90-4.
[60] Andress MIL ¶ 10.
[61] *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).
[62] Andress MIL Br. 13-14.
[63] *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993))
[64] *Daubert*, 509 U.S. at 591.

intensity of th[e] fire"[65] is unquestionably relevant to this dispute, as it is an element of Brethren's affirmative defense.[66] Andress need not conclude that Andrews himself caused the fire for his opinion to be relevant. Andrews' arguments that Andress' opinion would not help the jury because "it is based entirely on speculation" are challenges to the reliability of Andress' opinion, not its relevance.

"Rule 702's reliability threshold requires expert testimony to be 'based on methods and procedures of science, not on subjective belief and unsupported speculation.'"[67] A pending amendment to Rule 702, scheduled to take effect on December 1, 2023, "clarif[ies] and emphasize[s] that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than to that the proffered testimony meets the admissibility requirements set forth in the rule."[68] The amendment was motivated by the Advisory Committee's "observation that in 'a number of federal cases . . . judges did not apply the preponderance standard of

---

[65]   *See generally* Andress Report.

[66]   *See Mele*, 453 F. Supp. at 1341 (identifying whether the fire was incendiary in nature as an element of the arson affirmative defense).

[67]   *UGI Sunbury*, 949 F.3d at 833-34 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017); *In re TMI Litig.*, 193 F.3d 613, 703 (3d Cir. 1999)).

[68]   Fed. R. Evid. 702, Advisory Comm. Notes, 2023 Amendments. The amended rule reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise *if the proponent has demonstrated by a preponderance of the evidence that*:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the ~~expert has reliably applied~~ *expert's opinion reflects a reliable application of* the principles and methods to the facts of the case.

Fed. R. Evid. 702 (effective Dec. 1, 2023) (italicized language added by amendment, struck through language deleted by amendment).

admissibility to Rule 702's requirements of sufficiency of basis and reliable application of principles and methods, instead holding that such issues were ones of weight for the jury.'"[69] The Committee emphasized that rulings which have held "the critical questions of the sufficiency of an expert's basis for his testimony, and the application of the expert's methodology, are generally questions of weight and not admissibility" "are an incorrect application of Rules 702 and 104(a)."[70] Thus, the amendment "echoes the existing law on the issue," rather than a change of the Rule 702 standard.[71] Therefore, the Court will take heed of the forthcoming changes so as to avoid the misapplication of Rule 702 identified by the Advisory Committee.

Brethren argues that Andrews "has not identified any fire experts nor has he presented any evidence that the reports of Alex Profka and Russel Andress are in any way deficient or discordant with fire investigation industry standards or protocols."[72] While true, it is Brethren who has the burden to "demonstrate by a preponderance of the evidence that the testimony is the product of reliable principles and methods and the

---

[69]   *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283-84 (4th Cir. 2021) (quoting Advisory Comm. on Evidence Rules, *Agenda for Committee Meeting* 17 (Apr. 30, 2021)).

[70]   *Id.* at 284 (quoting Advisory Comm., *Agenda* at 105, 107).

[71]   *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). *See also Wood v. Showers*, 822 F. App'x 122, 125 (3d Cir. 2020) (rejecting "lower bar for expert testimony" where flaws "such as the reliability of an expert's principles and methods would be primarily a question for the jury and would not be screened by the trial judge"); *U.S. v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (observing that "'a trial judge acts as a gatekeeper to ensure any and all expert testimony is not only relevant, but also reliable' . . . [b]efore the proposed testimony gets presented to the jury.") (quoting *Pineda v. Ford Motor Co.*, 520 F. 3d 237, 243 (3d Cir. 2008)); *TMI*, 193 F.3d at 665 (observing that the proponent of expert testimony must show the testimony is reliable by a preponderance of the evidence).

[72]   Andress MIL Opp. Br. 2.

expert's opinion reflects a reliable application of the principles and methods to the facts of the case."[73] Reliability does not require that the "opinion is supported by the best methodology or unassailable research."[74] An opinion may be reliable "even though the judge thinks that the opinion is incorrect."[75]

Andress' "Determination" includes four distinct opinions: (1) the "fire did originate within the open stairway which leads to the upper levels of the structure;" (2) "the reignition of previously extinguished wood stairs . . . along with the identification of ignitable liquids by accelerate canine Locke indicate that an accelerant was poured onto the stairs to enhance the spread and intensity of this fire;" (3) "[t]he ignition source for this fire is a competent ignition source introduced to the ignitable liquid soaked wood stairs . . . by the human hand;" and (4) "[a]ll reasonable accidental ignition sources were eliminated during [Andress'] investigation."[76]

Profka, the expert originally retained by Brethren, noted in his report that he "conducted the investigation on all dates according to NFPA 921, which included the elimination of accidental causes."[77] Andress' *curriculum vitae* states that he "use[s] a systematic approach utilizing the Scientific Method as outlined in NFPA 921,"[78] and

---

[73]   Fed. R. Evid. 702 (effective Dec. 1, 2023).

[74]   *Karlo*, 849 F.3d at 81.

[75]   *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 744 (3d Cir. 1994); *see also TMI*, 193 F.3d at 664 ("Thus, plaintiffs do not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'") (quoting *Paoli*, 35 F.3d at 744).

[76]   Andress Report 16.

[77]   Profka Report 2.

[78]   Andress CV, Opp. Ex. C, Doc. 90-3 at 1.

"NFPA 921 qualifies as 'a reliable method endorsed by a professional organization.'"[79] However, there is no mention of NFPA 921, or any other standard in his report. Andress' report simply states that his "investigation was completed using the provided photographs, reports, and depositions along with a physical site visit, and interviews."[80] The Court addresses these defects and their impact on the admissibility of each of Andress' opinions in turn.

### 1.     Origination

Andress bases his opinion that the fire began in the stairway on "examination of photographs . . . as well as interviews with Deputy Chief Ken Pilkus who was inside the structure during the initial fire attack."[81] He first concludes that "it was clear that this fire began within the structure."[82] He notes that a photograph taken by Pilkus during the fire "shows heavy fire in the common hallway at the stairway" and that post fire photographs "clearly indicate a sustained fire in the stairway which compromised the structural integrity of the stairs above resulting in their collapse."[83] Further, these photographs show evidence of a "clean burn" of the staircase,[84] which, contrasted with the "fire damaged but intact" structures in other areas, revealed "no indications of fire

---

[79]   *Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012) (quoting *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058-59 (8th Cir. 2005)).
[80]   Andress Report 1.
[81]   *Id.* at 3.
[82]   *Id.*
[83]   *Id.*
[84]   *Id.*

origin except at the staircase."[85] But Andress does not, however, explain *why* evidence of a clean burn is sufficient to show that the fire started in a certain area.[86]

### 2. Accelerant

The basis for Andress' opinion that "an accelerant was poured onto the stairs to enhance the spread and intensity of this fire" is (1) "the identification of ignitable liquids by accelerant canine Locke," and (2) "the reignition of the previously extinguished wood stairs as witnessed by Deputy Chief Ken Pilkus."[87]

### a. Accelerant Canine

In his analysis regarding the presence of a liquid accelerant, Andress begins by describing the process in which an accelerant canine, Locke, alerted to the presence of ignitable liquids. He notes that Locke "alert[ed] to the presence of ignitable liquids at the entrance of the staircase on the main level" and" in the debris fields beneath the collapsed staircase."[88] Dauphin County Detective Dennis Woodring, the handler for Locke, then set up a "can test" for Locke in which he arranged cans of debris samples from the areas where Locke alerted along with cans of samples known to be free of ignitable liquids.[89] Andress states that Locke alerted to the samples from the debris field

---

[85] *Id.* at 4-5.
[86] *Cf. Chester Valley Coach Works, Inc. v. Fisher-Price, Inc.*, 2001 WL 1160012, at *8 (E.D. Pa. Aug. 29, 2001) (discussing expert testimony in which expert "pointed to particular sections of NFPA 921 that support his conclusion that evidence of 'clean burn' and/or 'spalling' in a given location are not necessarily indicators of fire origin").
[87] Andress Report 16.
[88] *Id.* at 4.
[89] *Id.* at 4-5.

near the stairs, indicating that the samples from the area near the staircase contained ignitable liquids.[90]

Samples from the debris field were subsequently sent to the Pennsylvania State Police Laboratory for testing, where "no common ignitable liquids were identified in the samples."[91] According to Andress, the Police Laboratory report offers three possible reasons for a failure to identify an ignitable liquid: (1) "no ignitable liquid present;" (2) "an ignitable liquid present below quantities required for positive identification;" or (3) "an uncommon ignitable liquid."[92] Andress suggests that the "unknown ignitable liquid was possibly diluted by the vast amounts of water used to extinguish this fire and the delay in recovering these samples."[93] Andress concludes that "[g]iven the alert by [Locke] on the debris as well as during a can test it is reasonable to conclude that an ignitable liquid was present but could not be identified by the laboratory."[94]

In *U.S. v. Hebshie*,[95] the United States District Court for the District of Massachusetts, granting a petition for habeas corpus and overturning an arson conviction, highlighted the unreliability of accelerant-detection canines:

> NPFA 921 circumscribes the use of canines; they are meant simply to be tools to help investigators narrow the search area for ignitable liquids. . . . What investigators refer to as "accelerants" actually represent a wide range of common and frequently benign materials. In addition, such chemicals can be created by the breaking down of materials during a fire, such as decomposing carpet and other adhesives. "Unlike explosive or

---

[90]   *Id.* at 5.
[91]   *Id.* at 14.
[92]   *Id.*
[93]   *Id.*
[94]   *Id.*
[95]   754 F. Supp. 2d 89 (D. Mass 2010).

drug-detecting dogs, these canines are trained to detect substances that are common to our everyday environment. Merely detecting such quantities is of limited evidential value." For these reasons, NFPA 921 requires not just laboratory corroboration, but also comparison samples."[96]

The *Hebshie* court is not alone: "Most courts have held that uncorroborated canine alerts are novel scientific evidence, not generally accepted in the scientific community of arson investigators."[97] Though Locke's handler did set up comparison samples, NFPA 921, the method Andress purports to apply, requires *both* comparison samples and laboratory corroboration.[98] Rather than a reliable application of NFPA 921 methods, Andress' conclusion that "it is reasonable to conclude that an ignitable liquid was present"[99] given the alert of Locke is contrary to those methods. Therefore, Andress' reliance on the alert of an accelerant-detecting canine does not pass the smell test.

### b. Reignition

After firefighters were able to "knock down" the fire on the stairs, it "re-ignited three times."[100] Andress concludes, without explanation, that this "was likely the result of the reignition of vapors from an ignitable liquid on the stairs."[101] Andress does

---

[96]  *Id.* at 110 (quoting NFPA 921 § 14.5.3.5).
[97]  *State v. Sharp*, 928 A.2d 165, 185-86 (N.J. Super. 2006) (collecting cases); *see also Landry v. State*, 380 P.3d 25, 33-34 (Utah Ct. App. 2016); *Harris v. Gourley*, 2013 WL 1294444, at *8 (M.D. Ga. Mar. 27, 2013) (observing that "dog sniffs for possible accelerant do not constitute substantive evidence of the presence of an accelerant") (citing *Carr v. State*, 482 S.E.2d 314 (1997)); *Jaslar v. Zavada*, 2009 WL 82553, at *7 n.10 (M.D. Pa. Jan. 12, 2009) (observing that, where an accelerant-detection canine hits on areas where chemical analysis found no accelerant, it "suggest[s a] lack of reliability of the results of the accelerant detection dog").
[98]  *Hebshie*, 754 F. Supp. 2d at 110.
[99]  Andress Report 14.
[100]  *Id.* at 5.
[101]  *Id.*

suggest that "[i]gnitable liquids which would have permeated the wood steps are not water soluble and their vapors would continue to ignite when subjected to an ignition source."[102] However, while this may explain how an ignitable liquid would have led to reignition if one was present, it does not establish that one was actually present. In his report, Andress does not consider any alternatives for reignition or explain why a liquid accelerant is the most likely cause. This logical leap, based on only Andress' *ipse dixit*, is insufficient to meet Rule 702's reliability standard.[103]

Even if the Court were to overlook the deficiencies of Andress' report regarding the presence of an accelerant, it would still exclude his opinion on this issue because his testimony would not "help the trier of fact to understand the evidence or to determine a fact at issue."[104] The parties do not dispute that an accelerant was detected in the stairwell—it is not a "fact at issue."[105] As Andress notes, the Pennsylvania Police Lab was unable to identify the accelerant, and Andress does not offer any additional color, supported by NFPA 921 or any other standard, which would broaden the jury's understanding of the issue.

### 3.   Ignition Source

Andress opines that the fire was ignited "by the human hand" and that "[a]ll reasonable accidental ignition sources were eliminated during this investigation."[106]

---

[102]   *Id.* at 14.
[103]   *Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citing *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).
[104]   Fed. R. Evid. 702(a).
[105]   *See* Andrews' Pretrial Mem., Doc. 95 at 13-14.
[106]   Andress Report 16.

Nowhere in Andress' report prior to the Determination section does Andress explain his basis for his opinion that the fire was intentionally set.[107] To the extent that Andress' opinion that the fire was incendiary is based on Andrews' financial motivations or past insurance claims,[108] "permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury."[109] To the extent that this opinion is based on his elimination of "all reasonable accidental ignition sources," it appears Andress has again applied a methodology rejected by the NFPA.[110]

Andress' elimination of all reasonable accidental ignition sources also does not reflect a reliable application of NFPA 921, or any other standard. Andress notes that the "only known mechanical issue in the building was a problem with the natural gas boiler in the basement" and eliminates this as a cause because "[n]o fire damage was found in the basement and no evidence of a natural gas event was identified."[111] Andress does not explain what evidence he might expect to find following a "natural gas event" or otherwise show how his elimination of this as a cause is in accordance with NFPA 921. Andress also rejects the opinion of Pennsylvania State Fire Marshal Vicki Spencer of a "potential electrical failure as there is no evidence to support an electrical

---

[107] *See generally id.*

[108] *See id.* 9-11.

[109] *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) (quoting *Siring v. Oregon State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013)).

[110] *See Muth v. Woodring*, 755 F. App'x 109, 114 (3d Cir. 2018) (observing that the NFPA "explicitly rejected the negative corpus methodology" in 2011).

[111] Andress Report 15.

malfunction."[112] Other than noting Andrews was unaware of any electrical issues, Andress does not explain what evidence of a potential electrical malfunction is missing.[113] Andress' failure to show his work here is particularly glaring, as he is not simply offering his own unsupported opinion, but also rejecting the opinion of another. Therefore, Andress' opinions regarding the ignition source must also be excluded.

The Court emphasizes that Andress' conclusions did not factor into its decision to exclude his report and testimony. On the contrary, Andress' conclusions, reached by a "Fire Origin and Cause" investigator with nearly 30 years of experience, appear eminently reasonable. This is precisely why they must be excluded.[114] Further, even if the Court assumes Andress applied the NFPA 921 standard, Andress appears to have reached a number of his conclusions contrary to that standard. Not only does this require the exclusion of those opinions, it raises questions about the reliability of the rest of the report. The Court will grant Andrews' Motion to Exclude the Report and Testimony of Fire Expert Russel L. Andress.

### F.   Insurance Coverage

Andrews seeks to exclude any evidence that he "sought a certain amount of insurance on the property, or to increase the amount of insurance on the property."[115]

---

[112] *Id.*

[113] *Id.*

[114] *See Sardis*, 10 F.4th at 283 (observing that, because "expert evidence can be both powerful and quite misleading," "the importance of the gatekeeping function cannot be overstated") (quoting *Daubert*, 509 U.S. at 592, 595; *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)).

[115] Coverage MIL, Doc. 75.

The parties agree that, prior to closing on his purchase of the building, Andrews, through insurance agent Eric Fryer, "purchased a replacement cost coverage policy from [Brethren] which insured the building for $2.2 million as well as $240,000 in business income loss coverage."[116] The parties also agree that Brethren, after an inspection of the Building, "dictated that the building coverage limit [be] increased to $2,864,434."[117] However, Brethren denies that Andrews did not request the business income loss coverage be increased to $500,000.[118]

Brethren does not oppose Andrews' Motion with "with respect to the issue of the procurement of the policy of insurance and the fashion in which the coverage limit for [the Building] was determined."[119] However, Brethren argues that the facts relating to Andrews "purchasing insurance in the first place" and "requesting that the limit for the business personal property [policy] be set at $500,000" "go to the issue of motive."[120] The disagreement between the parties regarding whether Andrews requested business income loss coverage and whether he requested the coverage limit to be increased is a factual issue, which is the province of the jury, and inappropriate for disposition on a motion in *limine*. Further, the Court agrees with Brethren, that, if Andrews requested

---

[116] *Id.* ¶ 4; Coverage MIL Opp., Doc. 82 ¶ 4
[117] Coverage MIL Opp. ¶ 5; Coverage MIL ¶ 5.
[118] Coverage MIL Opp. ¶ 5. *Contra* Coverage MIL ¶ 13 ("At no time did Mr. Andrews request or demand the stated business loss coverage.").
[119] Coverage MIL Opp. Br., Doc. 83 at 2.
[120] *Id.*

that coverage or the subsequent increase, that it is evidence that may prove motive, which is a component of Brethren's arson defense.[121]

Therefore, the Court will grant Andrews' Motion to exclude evidence that Andrews "sought a certain amount of replacement value insurance or asked for an increase in replacement value insurance coverage." The Court notes that the relief sought by Andrews is narrow. The Court does not understand Andrews to be seeking to exclude evidence relating to the business income loss coverage and the circumstances regarding Andrews' initial purchase of either policy.[122] Also, Andrews does not ask the Court to prohibit the introduction of evidence relating to the type or amount of coverage for purposes other than to suggest that Andrews affirmatively sought a certain coverage type or amount. The Court's Order granting Andrews' Motion therefore will only grant the narrow relief requested.

## IV.   CONCLUSION

For the foregoing reasons, Andrews' Motions in *Limine* relating to the purchase price and sale price of the property are denied; Andrews' Motions in *Limine* relating to the prior water loss, prior fire loss, the expert testimony of Richard Andress, and the replacement value insurance are granted; and Brethren's Motion in *Limine* to exclude evidence of the absence of an arrest or prosecution is granted.

---

[121]   The Court also notes that this issue is not presented by Andrews' Motion *See* Coverage MIL Proposed Ord., Doc. 75 (proposing the Court preclude Brethren from "making any reference or insinuation that [Andrews] "sought a certain amount of *replacement value insurance or asked for an increase in replacement value insurance coverage*) (emphasis added). The Court nevertheless addresses the issue for the avoidance of doubt.

[122]   *See generally* Coverage MIL.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge